The question that the court has to answer today is whether it intends to follow the conventional wisdom and common sense that has been adopted by nearly every other circuit, or in fact every other circuit, to squarely address this issue. Namely, whether the government must justify the use of destructive force, even at the border, with some form of individualized suspicion. Well, here they had a narcotic detection canine alert to the rear of the truck. What does that suggest? Your Honor, first, the government has, did not argue, and I know today will not come up here and argue, that there was reasonable suspicion justifying the search. But for the court's benefit, we don't know if the dog alerted, we don't know if the dog cast it. I was precluded the opportunity of confronting any evidence concerning the dog, the dog's liability. I made a specific motion for evidence that this Court has recognized as material to our defense in Sedano-Arellano for dog discovery. And the court itself said that the dog's alert was not necessary to its decision, because it found that this search in the old lingo was a routine search. Likewise, I would point to the fact that the dog alert was not necessary to its decision, because it found that this search in the old lingo was a routine search. We don't need reasonable suspicion, et cetera. But then the district court seems to go on and make some findings on reasonable suspicion. And it's not just the, it's the drug dog. It's the density buster, the removal of the tire that seemed heavy. And then from that, the district court says, this is three factors, from which there was more than reasonable suspicion that the tire contained something more than error. And let me specifically address what occurred right after the court made that alternative holding. I specifically reminded the court that I had made a discovery request with respect to both the dog and to the buster. I was never allowed an opportunity to confront the agent or to see if he could lay a foundation for, you know, what he assumed was a high rating on the buster. Likewise, the agent's assumption that this tire felt heavy, there was no opportunity to confront that evidence as well. What did he mean by a tire feeling heavy compared to a done-up tire from a Yugo? I don't know. So fast forward. Your argument is your argument then that although the district court made the finding, it did so in absence of a hearing that you, to which you're entitled. Well, it's that, but it's one more thing. Because if you look at the excerpt of records, and I believe it's page 63, I asked the courts for an evidentiary hearing. And I said, but that may not be necessary if I understand what the court's holding was in that case or finding was. And I said, if that is that this is simply a routine search, then we're not talking about reasonable suspicion. And the court agreed with me. No, my holding is, my ruling is that this is a routine search that doesn't require reasonable suspicion. What do you do about Camacho? Camacho? Camacho was a challenge to the safety of an individual when a buster is used in close proximity to that individual. And Camacho, the opinion of Camacho is that there's no evidence that there's any. But it said it was a routine search that didn't require reasonable suspicion. And the search, of course, was of the spare tire, not of the person. Right. And my point here, for purposes of this case, is that I didn't have an opportunity to confront the reliability of the buster or its use or how it was used by an agent. Those are wholly separate from the issue that was raised in Camacho. Yeah, but haven't we sort of foreclosed that argument? I don't believe that it is foreclosed, Your Honor. Whether using the buster as routine or not is not what the court addressed in this case, which is whether cutting open a spare tire is a routine search or not. So the way you present the case to us, we ignore the dog, we ignore the buster, and we simply have to decide whether Flores Montano allows the cutting open of a spare tire with no information at all, just, well, here's a car, here's a spare tire, let's cut it open, see if we find anything. Your Honor, that is my position. And I would say that if the court agrees with me, then the conviction should be reversed, mainly because the government did not rely on reasonable suspicion below. And when I pressed the court on it, it clarified that it wasn't making that determination. Certainly, this court could consider an alternative, perhaps remanding for a hearing. But our position is that that was waived by the government and the district court didn't rely on it, and that's the way the case comes to this court. Now, to get to Flores, this case was argued originally under the Molina-Terezon framework. We know that that framework has been rejected by the Supreme Court. Hardly rejected. We like adjectives. Hardly rejected. Adverbs. Non-routine distinction. But there were two other points that need to be noted. First, when it rejected the Molina framework, it was concerned about complex balancing tests and the use of factors such as potential for fear and potential for danger and fear of safety. We've all read it. What's your point? And my point is this, that it specifically left open the possibility there is an important distinction between destructive searches and non-destructive searches. Right. And I think that crystallizes the issue for this court in determining whether cutting open a spare tire, which is certainly destructive force, requires some form of search. Just as a matter of curiosity, how is it destroying the tire when presumably the tire had to be destroyed to get the stuff in it? Well, to answer your second point, first, I'm not sure the tire had to be destroyed to get to the stuff. We know that tires can be separated from rims without destroying the tire. But in this case, cutting open the tire requires, and I don't know if the picture was not submitted by me in the excerpt of records, but the sidewall of the tire was cut open. I don't think the government is here today to contest that the tire was destroyed by cutting open the sidewall of some sharp object. In my experience, it's been knives used by the inspectors. It's not in the excerpts, but it's in the record of the case. Okay. Yeah. Okay. So my position is that it is a destructive search and it does require reasonable suspicion. And I'd like to... Hang on. There is in the record a photograph of the tire cut? No, Your Honor. There is not. I could submit that as... No, no. I mean, my question to you was, did you submit it before the district court? No, Your Honor. As you'll see from the excerpt of records, from the motion here, it's very truncated. No, I understand. The yes or no would be fine on that. No, Your Honor. Okay. Thank you. But I don't think... What is the evidence of the tire being destroyed? Well, the uncontested evidence that the tire was cut open. The government hasn't posited that there was anything other than a cutting open of the tire. There is evidence. Somebody said, I cut the tire open or somebody else cut the tire open. Yes. And the government's not disputing that today, I'm certain. Assuming that there was a cutting open of the tire, it's destructive. And the question, I think, after Bennett is, what did Bennett mean by especially destructive? The Supreme Court said... And I think that that extra adjective is problematic. And I think that this court has the opportunity to clarify what that means. And should look back at what the concerns were for the Supreme Court in Flores, which was unintentional destruction. A dog scratching the paint off of it. Does Flores suggest, well, if you don't like it, go sue and get the money for your tire? Excuse me? Does Flores suggest that the alternative is the government will pay for your destroyed tire? I don't think it goes so far, Your Honor. There may be theoretical, there may even be potential ways of recovering money or recovering damaged property. But the difference between what the court was addressing in Flores was a car that ostensibly had everything reassembled and it left the port of entry intact without destruction. What you have here is a car leaving the port of entry with a destroyed tire. There's no indication that the destruction of the tires were limited to spare tires. Or you can leave the port of entry with a slash through your upholstery. And you may at some later date in the future be reimbursed after you go through significant trouble. But the Fourth Amendment. If damage to a vehicle were to occur, the motorist might be entitled to recovery. 31 U.S.C. 3723. That's correct. They may, Your Honor. But the Fourth Amendment concern here, concerns of property interest. And while you may be made whole at some later point in the future, is really a theoretical possibility that individuals have a Fourth Amendment right. And we're talking about innocent people, criminals alike, to come to a port of entry with a property interest that they have an expectation that that property will not be unnecessarily, randomly damaged without suspicion. Are there any cases after the newly decided Flores-Montano that illuminate what's so destructive as to require a different result means? I can only point to this circuit's decision in Bennett where there was drilling into the gas tank of a boat. Certainly it wouldn't have entertained this discussion if it didn't feel that that fell in that category. Now that court did not decide whether reasonable suspicion was required for that because reasonable suspicion was amply demonstrated in the record. But drilling into a gas tank, much like the cases cited by Flores, which still stand from every other southern border district, the 5th, the 10th Circuit. It's a note in my reply brief, the 11th Circuit's Moreno. Those were cases involving exploratory drilling and putting a knife into a tire is no different and perhaps is even worse. Exploratory drilling may require some minimal cosmetic repair, whereas cutting into the sidewall of a spare tire is ostensibly going to require a whole new tire. You don't plug a cut into a tire that reveals what's inside the tire. It would have been all right to pull the tire from the rim. Well, then we're in a situation where maybe we're not talking about so destructive a force is. Because Camacho certainly approved the search of the tire. What you can't tell from the opinion is whether, is how that search was executed. You're referring back to Camacho. Now, I don't think that was ever made a part of the record of how that. No, I think it wasn't. They said the search wasn't destructive. But the search, they approved the search. So, so if it's, in other words, the Constitution turns on the slitting the tire. It does, Your Honor. It turns on the destructive nature of the search. And in this case, there was a cutting of. Not just tearing it apart. I don't understand. Well, I mean, tearing, tearing the tire apart would be okay. So, it's just a question of whether splitting it. Tearing it apart would be, would, you're insinuating, I believe, that there's destruction of the tire. Well, I mean, the tire. Separating it from the rim, okay, maybe we have a different situation. That's not the situation in this case. And I don't think it's what the government is arguing. They should have the license to do without reasonable suspicion. Do you want to save 50 seconds to rebut? That would be excellent, Your Honor. Thank you. Good morning, Your Honors. May it please the Court. Patrick O'Toole on behalf of the United States. Your Honors, I don't think that this is a Camacho case. This is Vargas Castillo revisited. And in Vargas Castillo, this Court held that the, and that was cutting open the tire. Exact same case that we have here. The search was routine because it did not reach the degree of intrusiveness present in a strip search or body cavity search, relying on Rommel science. This, at our circuit, in the Ninth Circuit, previous to Molina Terrazon, the Court had gotten this issue correct. Rommel science, the Court limited the non-routine exception to cases involving body searches. That's exactly where we were in Rommel science. Most, Sandoval Vargas, most was a drilling case into a paperweight coming from Thailand, if I remember correctly. Vargas Castillo was even post Molina Terrazon. And the reason why the result was still the same, that the search was routine, because Vargas Castillo, it turned on how great a danger did the cut tire represent. And since the cut spare tire didn't represent great danger, even under Molina Terrazon, which has since been discredited, the search was still routine. It did not require reasonable suspicion. Well, I didn't quite read the case that way because it didn't seem to reach the question of whether or not, I mean, reasonable suspicion existed when they cut the tire open at that point. It did. There was not an argument. Go ahead. No, I mean, I'm, I'm reading per blank. There was no, there were alternative holdings in Vargas Castillo. And the defense position is that what I'm reading was dicta, but it's 722, 329 F3D 715 at 722. The search was routine because it did not reach the degree of intrusiveness present in a strip search or body cavity search. Relying on Ramos science, Ramos science, where the court surveyed Ninth Circuit cases and analyzed Montoya de Hernandez and held a border search goes beyond the routine only when it reaches the degree of intrusiveness present in a strip search or body cavity search. What we have in effect, your honors, in the Ninth Circuit previous to Molina Terrazon was a per se rule that if it's a search of a person, then it can be non-routine. If it's a strip search, if it's an involuntary x-ray search, if it's a body cavity search, but if it is a property search, it is per se routine and does not require reasonable suspicion. That is where we were until Molina Terrazon. And I argued a border search case before your honor, Judge Traj, just a few weeks ago. You quickly pointed out it was the first case after Flores-Montano. The Ninth Circuit got it wrong in Molina Terrazon. Yes, you've said that repeatedly here. And we did. And what we are left with after Flores-Montano is this. We again leave open whether, this is the Supreme Court, I'm citing from page 1586, we again leave open whether, so the question is open whether it applies at all and under what circumstances a border search might be deemed unreasonable because of the particularly offensive manner it carried out. In Flores-Montano, citing back to Ramsey, which of course was a letter case. So unless the case, unless the defendant proves that a property search was so destructive as to be particularly offensive, they lose. The government can damage property as part of a border search. And there's a particular reason for that. In Flores-Montano, and I handled that case in the court below, District Court and the Court of Appeals. The record established that there were 3,000 vehicle property search cases a year at the border. Approximately 25% involve gas tank cases. In these cases, it is simply not the case that the government sees the car at the border and in the front seat and in the back seat, you have open marijuana and open cocaine and open heroin. The drugs are hidden. And because they're hidden, the government has to be able to open up the container in order to search to see what there is. Right. But let's take the example of separating the tire from the rim. Then I think it's classic non-destructive routine search. I grant you that. Okay. Destroying the tire seems to be an open question. Is it your position that you, and I know they would not choose to do this, but the officials at the border could cut open and destroy every single spare tire that came through the border without any, with only monetary consequences? Well, Vargas Castillo holds that. Well, I mean, let's leave that aside because I, because I, I may disagree with you, but I mean, is that your position that that's, that, that is what? The government's position is that we can use damaging force at the border as far as searching. This is a hypothetical that I would use. A locked trunk of a vehicle. If the trunk is locked, the defendant doesn't have a key to it, we can bust open the trunk to see what's in. If somebody's coming across the border with a pinata, a very common occurrence, a closed container, we can drill a small hole in the pinata to see what is there. Now, what we can't do is if we want to search the trunk and the person says, here's the key to the trunk, and we say, we just don't like you. We don't want to use your key. So we want to bust open the trunk. Then you have an issue of unnecessary, wholly unnecessary damage, different issue. Or if we say, we don't want to just bust open the trunk, but we want to get a giant saw and cut the vehicle in half. We can't do that. Why is that different from cutting open a tire? Well, a spare, many people don't even have a spare tire. You're not obligated to have a spare tire. Yes, we cut open a spare tire. And you know, I like a spare tire. I like, I mean, I'd like to have a truck in my car. Why is it different to cut open a trunk and take an ax to a trunk in a way that, or a pinata and destroy it, as opposed to destroying a spare tire with, by cutting a hole in it, as opposed to taking it off and looking what's in there. I know it takes more time. I'm just asking you theoretically. I don't understand the difference. I mean, well, I don't understand the difference. The government's position is that we can use damaging force as part of the search. Right. The question is how dam, one thing, and you can damage without destroying. In other words, the out of circuit cases that the defense was relying on, which were wrongly decided. I mean, they didn't rely on Montoya de Hernandez. They didn't rely on the limitation of Montoya de Hernandez. And they clearly were before the Supreme Court, but you have a small hole being drilled. Now that is damage, but it is not destruction. You can play. I think you will concede that cutting open a tire is destructive. You can't use a spare tire after you've taken a knife to it. Well, not necessarily. I mean, if, for example, you have a tube, you have a tubeless tire, you have a tube tire. If you have a tube tire, which simply isn't in the tire at that point in time, because it's stuffed with drugs and you get a drill or you cut a small hole in the tire, that tire is still good if you insert a tube in it. I mean, my bicycles, I mean, it is. But even if it isn't, it is a spare tire that is being used to smuggle drugs. In this case and in Vargas Castillo, the government is allowed to use damaging force if necessary to search. The tire is being used as a container. Right. So as a truck. I don't understand the difference in your argument. Well, the trunk, we can bust open the trunk to search it. All right. Because that you can open it. You know, you can open the trunk by busting the lock. That's fundamentally different and qualitatively different than getting into the trunk of the car by blowing the car up or by using a giant saw to cut the vehicle in half. You've not only damaged. Well, now I thought you were just cutting the trunk in half. Now you're going after the whole car. I mean, that's what I'm talking about. No, I like your giant saw. It's this monster machine rolling out of customs. Zoom. That's the end of the car. But the issue becomes this. The Supreme Court in Flores-Montano has changed, has changed the rules. It has said that you cannot, if I might read this very briefly, the Court of Appeals, our Court of Appeals, took the term routine, fashioned a new balancing test and extended it to searches of vehicles. But the reasons that might support a requirement of some level of suspicion in the case of highly intrusive searches of the person, dignity and privacy interests of the person being searched, simply do not carry over to vehicles. Complex balancing tests to determine what is a routine search of a vehicle as opposed to a more intrusive search of a person have no place in border searches of vehicles. So then they run to the other end of the line and they say, but there's something that's so destructive or particularly offensive, even in property searches, that it might invoke the Fourth Amendment. Well, that's what they say, reading it at 1536. And your answer to that is that would be something that's just simply gratuitous, like, yeah, you've got a key. So what? We're breaking open your trunk anyway. It is gratuitous in that instance or so completely unnecessary for what you want to search. Again, if it's narrowly tailored to the objective at hand, you can damage or destroy. You can damage. Yes. And that's why you have a difference between busting open the lock to open up the trunk and getting the giant saw to cut it in half or getting some kind of bomb to blow it up. Well, here they took a giant saw, right? The equivalent of a giant saw, you can just saw the, I mean, you destroyed the tire here and there's no doubt about that, right? No, I mean, I, we don't know that. I mean, if they, if we put a. So you're not, is your argument here that the tire was usable after you cut it open? The tire was cut open. The tire was damaged. I don't know if it was a tubeless tire or not a tubeless tire. It's probably the case that the spare tire in this case was no longer usable. I mean, I don't want to quibble on, on that. And if the government didn't find drugs in this case and the panel wants to establish a rule that if we search without cause, which the government clearly can do at the border, but if we search without cause and we don't find contraband that the government has to pay for it, let that be the rule. But it shouldn't affect it. Mr. Yes. G approved. You're finding the government. I don't like the, uh, uh, I argued cases, but I don't write the civil side. I don't have to worry about that, but that should be the remedy. In other words, simply if we conduct a search with the search form, what's the point of making a distinction between destructive and non-destructive searches in the fourth amendment context? Then anyway, I mean, there's, there is a difference. There seems to be a difference. Well, or at least it's an open question. I don't think it's an open question. I meant to our circuit. It wasn't open question. Tell Melina Tara's on, but the more important issue is what is a search? If a vehicle comes across the border in the suitcases locked, can the government search it or not? That's the question. Now, if, if it's a briefcase or a suitcase that can be opened up with no damaging force is the rule going to be that's okay. But if it is a locked briefcase, if it's a locked trunk, if it's a closed container, if you require reasonable suspicion for a damaging search, you in effect are saying we cannot search the item. What's the difference between your giant saw analogy and using a knife on the tire? When everybody seems to know you can take a tire off of a rim, big O does it every four seconds. It seems to me that if it's reasonably tailored to what you're after, you just take the tire off the rim. Why do you have to cut it? And that's the equivalent of the giant saw on a miniature scale. Well, if the difference is, I think this, we're talking about the car itself, which is a valuable commodity in its entirety. If you're talking about, yeah, let's say it's a locked glove box. Okay. Now, yes, we could take a screwdriver and just pry it open, or you could get two or three inspectors, pull them off what they're doing elsewhere, and probably find screws somewhere if you disassembled enough of the car and undo those screws so you wouldn't have to bust open the glove box at all. But that's not the test. In fact, the Supreme Court, you can't, I mean, just to get back to Judge Stroud's question, because it's mine too, it seems to me that your argument makes perfect sense if you're taking the tire off the rim and you're not destroying the tire. You say, well, we have to get in the lock box, but we know there's a method of getting to what's in the tire without cutting it open. Well, assuming that you can, assuming that you have the equipment, I mean, we have 2,500 miles of border between us and Mexico. There are stops that are made at ports of entry, there are stops that are made at small ports of entry, and there are stops that are made entirely along the ports of entry or between the ports of entry where there's no ports of entry at all. So a border patrol agent stops a vehicle, they have some intelligence information that spare tires are being used more often to smuggle drugs. There's a spare tire in the vehicle, they grab the spare tire, but it's short of reasonable suspicion, or the government isn't producing two or three witnesses to give the reliability of a density buster or the reliability of the dog. I mean, this isn't a random, whatever this is, this case is not a random cutting open of a tire. No, but that's your argument. I mean, you know, it's easy to say, here, you've got reasonable suspicion, sure, cut open the tire. Absent reasonable suspicion, if there is an alternative, why would we allow destructive force to be used randomly on the border? Your Honor, to suggest that why would we allow the state, the Supreme Court's ruling, I had that. No, no, destructive force is, I think. Destructive force wasn't reached in that case. Your Honor. I mean, you seem to be arguing, and I don't mean to disagree with you, but you seem to be arguing that you need a reasonable approach. And maybe I'm misinterpreting it. You're saying, well, we just, we take a less intrusive approach. We can't, we can't destroy the trunk or the suitcase. We can pry open the lock. And you can't take a giant saw, but you can do something else. I just, in this particular context, I don't understand the difference in your argument, and I may be missing it. I'm just saying, well, we can cut it open, but we aren't required to take it off absent, you know, just on a random basis. You know, I hear you saying every time a car drives into a border inspection place, somebody can walk up for no reason at all with a knife and just cut open square tires. And you're saying, yes, yes, it's really fine. Rob, the Commissioner of Customs, decides I'm going to equip everybody with a box cutter and we're going to cut open everybody's spare tire. We don't care whether there's reasonable suspicion or anything like that. We're just going to cut open all the spare tires. And you say that's perfectly all right. What I'm saying is, as far as the admissibility of evidence in a criminal case, the evidence is not suppressed unless, per the Supreme Court, the particularly offensive or so destructive manner of the search. That is all that's left over. And a few minutes ago, you told us particularly offensive is really informed by whether it was necessary under the circumstances. And a giant saw isn't, and a bomb isn't, and all this kind of stuff. But why doesn't a box cutter fall into the same situation if you could take the tire off the rim? We're now starting to beat the dead horse. Well, I think what your honors are getting into is what has been rejected by the Ninth Circuit, which is this sliding scale of cause or sliding scale of damage. In other words, we shouldn't have it where if you use a print pick needle to go into the tire with a very, very small hole or a small cutting, which is very well might have been all that we had in this particular case, that that's different than, you know, we didn't blow the tire up. The rim is still fine. We don't know how much this costs. It could be a $10 item that is a spare. Now, it might be a different situation if you're stopping somebody in the middle of the desert and you use this knife and you pop the tire on a vehicle that would be running at that place and you say, sorry, we're going to leave you in the middle of the desert and you don't longer get to drive the car because, you know, we cut your only tire there. But a spare in this particular context, would it have been better? Could they have? I don't know if they couldn't, if they had the equipment to take it off the rim, if they've got that kind of material or not. I don't know how busy the inspectors were relative to how many cases they had at the border. In the time that's not remaining, let me ask you another question. Do you accept the defendant's presentation of this case as one involving no reasonable suspicion because he was blocked from attacking the dog and the buster device? We just shouldn't decide it on the ground that there was reasonable suspicion. What government counsel did in this case was the government counsel, it was not me below, elected not to put on the evidence that would have established reasonable suspicion. But there's no evidence that this was randomly done. Okay. I accept your statement. Let me ask a follow-up though, because when I approached this, I mean, I looked and saw the district court's finding on reasonable suspicion and said, well, all right, I mean, there it is. Cites three reasons, find reasonable suspicion. And counsel points out today quite properly, I think, is, well, I said, wait a minute, I need, I want a chance to attack that. And therefore, if you're holding X, if you're holding it's routine, we don't need to get into it if you're relying on reasonable suspicion, then I would like to. And it seems to me that counsel is probably correct in that he was foreclosed at that point from raising the issue. So what's your position? And counsel below on your side said, we're not relying on reasonable suspicion. I would never try to go back on a representation that was made in district court. What I'd like to close with is this. It wasn't randomly done, but the government has 3,000 of these cases a year. Defense counsel, and I would if I were defense counsel too, they bring voluminous discovery motions wanting all the background information on these dogs, on the density meters, how they work. And they want us to be producing week after week, in thousands of cases, inspectors to testify about how the density meter works, whether it's this or that, whether the dog is reliable. The government chose in this case, as we do in many cases, we're not required to do that. And I think you may have misunderstood my question. I'm sorry. My question simply was, right now, how do we deal with the district court's finding? And my guess is we can't rely on it because of the factors defense counsel said. I wasn't asking for how difficult your job was. I'm sure it is. Under the unique facts of our case, the government weighed below any reliance on the alternative argument of reasonable suspicion and relied that this was a routine border search. And we're relying on that under Vargas Castillo and under the Supreme Court's case of Flores-Montalvo. Thank you, counsel. That makes our case very easy. You have 50 seconds. I think we understand it, but if you have to say something. Just briefly, Your Honor, I think the court is well aware of the difficulties of line drawing when we talk about what is necessary or unnecessary force, which is the government's position of what would limit or constrain it. I just want to briefly talk about Vargas Castillo and why, an additional reason why it needs to be reconsidered. Even if you don't agree that there's a troubling aspect to its advisory nature, that it is dicta when there wasn't even that issue before the district court argued in front of the district court. There's another reason. Flores requires it to be reexamined. If you look at Vargas, it relies on Ramos-Stein's, a case that dealt exclusively with the search of the body, whether it was permissible to request someone to remove their shoes. And it relies on Molina, but in relying on Molina, it says because there was no potential for fear and there was no potential for danger. What it left open was whether the destructive nature, the use of force, the one thing the Supreme Court left open in Flores, what effect that had. It looked at the discounted factor. So I believe after Flores, Vargas is fair game for this panel to reconsider this issue. Thank you both. Case argued, the score is admitted. We'll go to the fourth case, which is Zivkovic.
judges: Trott, Rymer, Thomas